Matthew Campbell
Federal Defenders of Eastern Washington and Idaho
10 N Post Suite 700
Spokane, Washington 99201
(509) 624-7606

Attorney for the Defendant

UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WASHINGTON
The Honorable Judge Rosanna Malouf Peterson

| | |
|---|---|
| United States of America, | No. 2:16-cr-0078-RMP-1 |
| Plaintiff, | Objections to PSR and Sentencing Memorandum |
| v. | |
| Dan Wayne Streetman, | |
| Defendant. | |

**Objections to PSR**

1.      ¶¶11-15      Mr. Streetman objects to these paragraphs and the facts contained therein.  These allegations relate to charges currently pending against Mr. Streetman in Jefferson City, Missouri.  (*See* ¶¶ 70-72).  Those charges remain pending, and no trial or change of plea has occurred in that state case.  In the current procedural posture, he objects to their consideration as either offense conduct or relevant conduct.

2.      ¶18    The allegations contained in this paragraph are speculative at best.  The declarant is only guessing at what she thinks may have happened.

Objections and Sentencing Memo

1

3.       ¶19    This paragraph is argumentative and speculative in regards to the use of the term "manipulated."

4.       ¶23    This paragraph is misleading.  The forensic review of digital evidence in this case did not uncover over "1,000 images and videos of child pornography," which would imply that over 1,000 individual files of either still photographs or videos which constituted "child pornography" as defined in 18 U.S.C. § 2256(8) were located in this case. Admittedly, thousands of nude images were located, but most were not marked as child pornography images in this case. The number of image files relevant constituting the offenses charged in Counts 1-3 is significantly less than 1,000.

5.       ¶23    Mr. Streetman objects to the five-level enhancement for pattern of activity. Applying this enhancement, as well as the multiple count adjustment (*see* ¶55), amounts to double counting.  Applying both of these enhancements in conjunction with consecutive sentencing (*see* PSR at ¶¶95, 116) amounts to triple counting.  Thus, the pattern of activity enhancement should not apply, which would lower the total offense level to 40.

6.       ¶116  Mr. Streetman objects to the guideline rang computation of 1080 months. As documented in Objection #5, this represents triple-counting.  Mr. Streetman asserts that the appropriate guideline range is established by a total offense level of 40, which results in an advisory range of 292-365 months, or 292-260 months (based on the statutory maximum sentence of 360 months).

7.       Application of U.S.S.G §2G2.1 as a whole -- When Congress first enacted 18 U.S.C. § 2251 in 1978, the maximum penalty was less than what is now the mandatory

Objections and Sentencing Memo

minimum. Then, the offense of production of child pornography carried a maximum penalty of 10 years imprisonment, and there was no mandatory minimum sentence. *See* Pub.L. 95-225, § 2(a), 92 Stat. 7. There was a 15 year maximum and a mandatory 2 year sentence in the case of a prior violation of the same statute. *Id.*

The Committee Reports from both the House of Representatives and Senate show Congress never intended the statute to apply to the conduct here--the taking of photographs for personal reasons. While Congress has since added language to the statute about using materials shipped in interstate commerce and court decisions have held that the use of a camera or computer made out-of-state is sufficient to bring the conduct within the statute, *see, e.g., United States v. Grzybowicz*, 747 F.3d 1296, 1306-1307 (11th Cir. 2014), Congress initially targeted those who shipped the images across state lines:

> There is presently no Federal Statute that prohibits the use of children in the production of materials that depict explicit sexual conduct. The Committee bill would prohibit the production of such materials for this purpose if the materials involved were to be mailed or otherwise transported in interstate commerce.

S. Rep. No. 95-438, at 3 (1977).

The concern was with the business of child pornography as evidenced by the conclusion "[t]hat child pornography and child prostitution have become highly organized, multimillion dollar industries that operate on a nationwide scale." *Id.* at 5. The concern was that "thousands of copies can be made from a single negative" and that "[a]s a result the cost of producing child pornography are minimal but the profits are often enormous." *Id.* at 6. Congress was confident, too, that federal prosecutors would not pursue "individual acts involving the use of children."

Objections and Sentencing Memo

3

The Committee is aware that Section 2251 may literally encompass isolated, individual acts involving the use of children in the production of sexually explicit materials. Section 2251 is not intended to reach all such isolated incidents, which are often are more appropriately the subject of state or local concern. The Committee fully intends that federal prosecutors will wisely exercise their discretion to reach only those cases which are the proper subject of Federal concern.

*Id.* at 16. The Committee Report from the House of Representatives shows, as well, that the legislation was aimed at something more than photographs taken for private purposes: "[T]he Committee agreed to report out a section of the bill which would penalize those people who induce a child to engage in sexually explicit conduct for promoting a film or photograph which would be transported in interstate commerce." H.R. Rep. No. 95-696, at 10 (1977).

With the advent of the Internet and the widespread access to child pornography, the penalties have increased dramatically. In 1986, Congress increased the mandatory minimum to 5 years for repeat offenders. *See* Pub.L. 99-500, Title I, § 101(b), 100 Stat. 1783-74. Ten years later, in 1996, Congress established a minimum mandatory sentence of 10 years for a first offender, with a maximum penalty of 30 years. *See* Pub.L. 104-208, Div. A, Title I, § 101(a), 110 Stat. 3009-30. The penalty for those with a prior conviction was increased to a minimum mandatory of 15 years, with a maximum sentence of 30 years and, for the first time, the recidivism provision applied to a conviction based on "the laws of any State relating to the sexual exploitation of children." *Id.* In 2003, Congress increased the penalties to what they are now: a 15-year mandatory minimum and a 30-year maximum for first offenders and a 25-year mandatory minimum with a 50-year maximum for those with a prior qualifying conviction. *See* Pub.L. 108-21, Title I, § 103(a)(1)(A), 117 Stat. 652, 653, 683.

Objections and Sentencing Memo

In modifying § 2251 and increasing the penalties, Congress has continued to make findings that show it was addressing something more aggravated than the taking of photographs for private purposes. Among the findings in support of the 1986 amendments, was that "child exploitation has become a multi-million dollar industry, infiltrated and operated by elements of organized crime, and by a nationwide network of individuals openly advertising their desire to exploit children." Pub.L. 99-500, Title I, § 101(b), 100 Stat. 1783-74. When in 2003, Congress increased the maximum penalties to their current levels, the findings included a quote from the Supreme Court decision in *New York v. Ferber*, 458 U.S. 747, 760 (1982): "The most expeditious if not the only practical method of law enforcement may be to dry up the market for this material by imposing severe penalties on persons selling, advertising, or otherwise promoting the product." Pub.L. 108-21, Title I, § 103(a)(1)(A), 117 Stat. 676. In its 2008 findings supporting a modification of the statute, Congress included the observation that "Child pornography is estimated to be a multibillion dollar industry of global proportions, facilitated by the growth of the Internet." Pub.L. 110-358, § 102, 122 Stat. 4001.

Each sentencing guideline "carve[s] out a 'heartland,' a set of typical cases embodying the conduct that each guideline describes." U.S.S.G., Ch. 1, Ft. A, §4(b). A district court may depart from a guideline in an atypical case outside this "heartland" - that is, where there is "an aggravating or mitigating circumstance of a kind, or to a degree, not adequately taken into consideration by the" guidelines. 18 U.S.C. § 3553(b); U.S.S.G. §5K2.0. The fact that Congress intended to punish the production of child pornography for

Objections and Sentencing Memo

the purpose of sales or other distribution thus provides ample support for a departure in this case.  The creation of pornographic images for personal use was simply not the harm that Congress intended to punish in drafting this statute.  Thus, Mr. Streetman's conduct falls outside the heartland of the type of conduct envisioned by the statute.

"A 'departure' is typically a change from the final sentencing range computed by examining the provisions of the Guidelines themselves. It is frequently triggered by a prosecution request to reward cooperation . . . or by other factors that take the case 'outside the heartland' contemplated by the Sentencing Commission when it drafted the Guidelines for a typical offense." *United States v. Cruz-Perez*, 567 F.3d 1142, 1146 (9th Cir. 2009). The Sentencing Guidelines provide that a below-guideline sentence might be warranted where the offense conduct "may not cause or threaten the harm or evil sought to be prevented by the law proscribing the offense at issue." U.S.S.G. §5K2.11. This is precisely the issue with Mr. Streetman. Even if the statutory and guideline framework is generally appropriate, its application is not appropriate under the particular facts presented here.

The guideline range set forth in the PSR of 1080 months is in excess of conduct that is far more aggravated. The comparison of his offense to others with similar penalties shows the penalties are disproportionally harsh. Had he committed second degree murder in violation of 18 U.S.C. § 1111, he would not be facing a mandatory minimum, and his guideline range would be roughly 20 to 24 years for Criminal History Category I. The penalties for acts of terrorism are less than those Mr. Streetman faces. If an individual used a "weapon that is designed . . . to release radiation at a level dangerous to human life," in

Objections and Sentencing Memo

violation of 18 U.S.C. § 2332h (a)(1)(A), (c)(2), he would be facing a harsh 30 year minimum mandatory sentence, as would someone who used a missile designed to destroy an aircraft in violation of, 18 U.S.C. § 2332g (a)(1)(A), (c)(2).

Between October 1, 2015 and September 30, 2016, nearly 30% of the defendants sentenced under U.S.S.G. §2G2.1 received downward variances or other non-government sponsored below-guideline sentences.[1] There has been a demonstrated trend in downward variances in cases sentenced under U.S.S.G. §2G2.1. In 1992 88.9% of defendants received a within-guideline sentence and none received a below-guideline sentence.[2] In fiscal year 2007, 63% of defendants received a within-guideline sentence, while 11% of defendants sentenced under U.S.S.G. §2G2.1 received sentences below the guideline range.[3] In fiscal year 2015, by contrast, only 42% of defendants sentenced under U.S.S.G. §2G2.1 received within-guideline sentences.[4]

---

[1] *See* United States Sentencing Commission Quarterly Report, Fourth Quarter 2016, at 16 *available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC_Quarter_Report_4th_16_Final.pdf (last accessed December 27, 2016).

[2] 2012 Report, p. 254.

[3] United States Sentencing Commission Final Quarterly Report 2007, at 14, *available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-entencing-statistics/quarterly-sentencing-updates/USSC_2007_Quarter_Report_Final.pdf (last accessed December 27, 2016).

[4] United States Sentencing Commission Final Quarterly Report 2015, at 14. *available at* http://www.ussc.gov/sites/default/files/pdf/research-and-publications/federal-sentencing-statistics/quarterly-sentencing-updates/USSC-015_Quarterly_Report_Final.pdf (last accessed December 27, 2016).

Objections and Sentencing Memo

This trend toward below-guideline sentences has an inverse relationship with the guideline itself, which has been steadily increasing. In the original 1987 guidelines, U.S.S.G. §2G2.1 provided for a base offense level of 25. U.S.S.G. §2G2.1 (1987). In 1996, the Commission increased the base offense level to 27 and added a 2-level increase if the offense involved the use of a computer. U.S.S.G. App C., amend 537 (Nov. 1, 1996). In 2004, the Commission again increased the base offense level to the current level of 32 and added five additional specific offense characteristics. U.S.S.G. App C., amend. 664 (Nov. 1, 2004).

This inverse relationship implies that district courts often feel that the advisory guideline range recommended by application of U.S.S.G. §2G2.1 yields unreasonably inflated ranges inconsistent with 18 U.S.C. § 3553(a), and precludes imposition of a sentence of imprisonment that is "greater than necessary" to fulfill § 3553(a)'s statutory sentencing factors. This is corroborated by the statement of reasons forms collected in the 70 out of 200 production cases in which courts downwardly departed in fiscal year 2010. In 53.5% of those 70 cases, the court varied downward based on the "nature and circumstances of the offense [and/or] the history and characteristics of the defendant," and in 18% of those cases, the court varied downward "based on the defendant's mental or emotional conditions."[5]

_____

[5] 2012 Report, p. 255–56.

Objections and Sentencing Memo

That judges are choosing to vary in child pornography cases is not indicative of judges who impose sentences "inconsistently and without regard to the federal sentencing Guidelines" process, but rather as an important mechanism by which the courts provide feedback to the Sentencing Commission.[6] After all, the Commission envisioned that such feedback from the courts would improve its ability to fulfill its ongoing statutory responsibility under the Sentencing Reform Act to periodically refinements to the Guidelines.[7] Moreover, the courts have held that a district court may "'vary from Sentencing Guideline ranges based solely on policy considerations, including disagreements with the Guidelines.'" *United States v. Engle,* 592 F.3d 495, 502 (4th Cir. 2010) (quoting *Kimbrough*, 552 U.S. at 101); *see also Spears v. United States*, 555 U.S. 261 (2009) (emphasizing a district court may categorically reject an unreasonably high Guideline that "yielded an excessive sentence in light of the sentencing factors outlined in 18 U.S.C. § 3553(a)").[8]

---

[6] Troy Stabenow, *A Method for Careful Study: A Proposal for Reforming the Child Pornography Guidelines,* 24 Fed. Sent'g Rep. 108, 109 (2011).

[7] *See* U.S. Sent'g Comm'n, *Report to Congress: Downward Departures from the Federal Sentencing Guidelines* (Oct. 2003), at 5, 20, *available at* http://www.ussc.gov/sites/default/files/pdf/news/congressional-testimony-and-reports/departures/200310-rtc-downward-departures/departrpt03.pdf (last accessed December 27, 2016).

[8] "The Guidelines and congressionally directed ranges are significantly harsher than community sentiment recommends." Judge James S. Gwin, Juror Sentiment on Just Punishment: Do the Federal Sentencing Guidelines Reflect Community Values?, 4 Harv. L. & Pol'y Rev. 173, 195 (2010).

Objections and Sentencing Memo

**Sentencing Memorandum**

While not an excuse or defense for Mr. Streetman's serious crimes, it is noteworthy that Mr. Streetman himself suffered both physical and sexual abuse as a child. Mr. Streetman never received treatment for the abuse he suffered, nor was there any meaningful intervention. Each will be discussed in turn. It appears that treatment is necessary and likely to be effective. By all accounts, upon his release, he will be supervised under the strictest conditions, which provide additional protection and deterrence from further criminal acts.

**A. Physical abuse**

Mr. Streetman suffered physical abuse at the hands of his father. (PSR at ¶77). This type of child abuse frequently exerts a devastating negative impact on children, not simply during childhood, but throughout their entire lives.[9] The growing body of research suggests that the emotional damage accompanying abusive and neglectful acts, and not solely the physical damage, may result in the most significant and long-term harmful effects

---

[9] Cicchetti D, Toth SL. Developmental psychopathology perspective on child abuse and neglect. *Journal of the American Academy of Child and Adolescent Psychiatry* 1995;34(5):541-565; Manly JT, Kim JE, Rogosch FA, Cicchetti D. Dimensions of child maltreatment and children's adjustment: Contributions of developmental timing and subtype. *Development and Psychopathology* 2001;13(4):759-782; Malinosky-Rummell R, Hansen DJ. Long-term consequences of childhood physical abuse. *Psychological Bulletin* 1993;114(1):68-79; Trickett PK, McBride-Chang C., The developmental impact of different forms of child abuse and neglect, *Developmental Review* 1995;15(3):311-337.

Objections and Sentencing Memo

on the child.  In a longitudinal investigation, Widom and Maxfield found that abused and neglected children were 1.8 times more likely to be arrested as juveniles than were their non-maltreated age mates.[10] More than 50% of maltreated children experience difficulties in school and approximately 25% require special education services.[11]

What is clear is that Mr. Streetman never received any intervention, counseling or other measures designed to address the harms caused by physical abuse.  Rather, it appears that the issue was largely swept under the rug.  Unfortunately, the same is true of the sexual abuse Mr. Streetman suffered as a child as well.  Based on the lack of criminal history in Mr. Streetman's life, it appears that the abuse he suffered went a long way toward instigating these offenses, by forever affecting his psyche.  "Child abuse and neglect appear to influence the course of development by altering many elements of biological, cognitive, psychosocial, and behavioral development; in other words, child abuse and neglect 'get under the skin' to have a profound and often lasting impact on development. Brain development is affected, as is the ability to make decisions as carefully as one's peers, or executive functioning; the ability to regulate physiology, behavior, and emotion is impaired; and the trajectory toward

_____

[10] Widom CS, Maxfield MG. A prospective examination of risk for violence among abused and neglected children. *Annals of the New York Academy of Sciences* 1996;794:224-237.

[11] Caldwell RA. The costs of child abuse vs. child abuse prevention: Michigan's experience; 1992. Available at:  http://www.msu.edu/user/bob/cost.html. Accessed October 29, 2004;  Veltman MWM, Browne KD. Three decades of child maltreatment research: Implications for the school years. *Trauma Violence & Abuse* 2001;2(3):215-239.

Objections and Sentencing Memo

more problematic outcomes is impacted." Institute of Medicine & National Research Council, *New Directions in Child Abuse and Neglect Research* 154 (Anne Peterson et al. eds., 2013), http://www.iom.edu/Reports/2013/New-Directions-in-Child-Abuse-and-Neglect-Research.aspx.

While it might be tempting to shrug off abuse from so long ago as water under the bridge, it would be a mistake to do so. The effects of such experiences are long-lasting and life-altering.  "[I]t is clear that adverse childhood experiences have a profound, proportionate, and long-lasting effect on emotional state, whether measured by depression or suicide attempts, by protective unconscious devices like somatization and dissociation, or by self-help attempts that are misguidedly addressed solely as long-term health risks." Vincent J. Felitti & Robert F. Anda, *The Relationship of Adverse Childhood Experiences to Adult Medical Disease, Psychiatric Disorders, and Sexual Behavior: Implications for Healthcare* 7, in The Hidden Epidemic: The Impact of Early Life Trauma (2009) (R. Lanius and E. Vermetten, eds.), http://www.acestudy.org/yahoo_site_admin/assets/docs/LaniusVermetten_FINAL_8-26-09.12892303.pdf. "[C]hronic, toxic stress like poverty, neglect and physical abuse — can have lasting negative impacts. A team of researchers recently showed these kinds of stressors, experienced in early life, might be changing the parts of developing children's brains responsible for learning, memory and the processing of stress and emotion." University of Wisconsin-Madison, Early Life Stress Can Leave Lasting Impacts on the Brain, ScienceDaily (June 27, 2014), http://www.sciencedaily.com/releases/2014/06/140627133107.htm.

Objections and Sentencing Memo

**B. Sexual abuse**

Child sexual abuse interacts with family background to produce disruption of a child's developing self-esteem and sense of mastery of the world (agency).[12]  Moreover, there is a tendency for victims to frequently become victimizers as part of a cycle.  Hilton & Mezey (1996) point to the belief that there is a progression from victim to victimizer, as child sexual abusers often report a history of sexual victimization. This is particularly common in pedophiles "whose preferred targets are boys" (Knopp, 1984). Hilton & Mezey make some further points: first, that the more deviant the patient population, the higher the rates of past victimization; second, that the choice of victims is dependent on the victims' physical characteristics, including age; and third, that there is often a tendency to abuse the victim in a way that replicates the offender's own experience of abuse.

Carmen et al (1984) report gender differences in the subsequent behavior of victims of sexual abuse: male survivors more often direct their reactions externally, whereas female survivors are more likely to internalize feelings and express them in self-destructive behavior. Further, in male survivors the problems include confusion and anxiety over sexual identity and inappropriate attempts to assert masculinity (Watkins & Bentovim, 1992).

_____

[12] Peters, S. D. (1988), "Child sexual abuse and later psychological problems", G. Wyatt and G. Powell (eds), *Lasting Effects of Child Sexual Abuse, California Sage*, Newbury Park, pp. 101 - 117.

Objections and Sentencing Memo

What is beyond question, however, is that sexual abuse can have negative consequences for children during the time of abuse as well as later in life, according to several recent research reviews. See J. H. Beitchman et al., "A Review of the Long-Term Effects of Child Sexual Abuse," <u>Child Abuse and Neglect</u>, Vol. XVI (1992), pp. 101-118; A. Browne and D. Finkelhor, "Impact of Child Sexual Abuse: A Review of the Research," <u>Psychological Bulletin</u>, Vol. XCIX, No. 1 (1986), pp. 66-77; and D. Finkelhor, "Early and Long-Term Effects of Child Sexual Abuse: An Update," <u>Professional Psychology: Research and Practice</u>, Vol XXI, No. 5 (1990), pp. 325-330. Initial effects reportedly have included fear, anxiety, depression, anger, aggression, and sexually inappropriate behavior in at least some portion of the victim population. Long-lasting consequences reportedly have included depression, self-destructive behavior, anxiety, feelings of isolation and stigma, poor self-esteem, difficulty in trusting others, a tendency toward revictimization, substance abuse, and sexual maladjustment.

## C. Treatment Works

Studies examining the effectiveness of sex offender treatment in the 1990's produced mixed or inconsistent results, but systematic reviews conducted more recently indicate that certain sex offender treatment approaches can and do work.  Specifically, cognitive-behavioral therapy and therapeutic communities have been shown to be effective in reducing recidivism.

Objections and Sentencing Memo

In 1996, the GAO published a review of sex offender treatment research based on 22 other reviews covering 550 studies. Their analysis found no consensus among the reviews about what treatment works to reduce the recidivism of sex offenders. Cognitive-behavioral treatment was most often reported to be promising, while psychotherapy was generally viewed as not being effective. Because most of the reviews reported methodological problems, definitive conclusions about the efficacy of treatment could not be drawn.[13]

Gallagher et al. (1999) conducted a meta-analysis of 25 evaluations of sex offender treatment and found strong evidence that cognitive behavioral approaches with relapse prevention components are effective at reducing recidivism. Sex offenders treated with cognitive-behavioral/relapse prevention techniques recidivated at a rate 8 percentage points below that of comparison sex offenders. In 2002, Hanson and his colleagues conducted a meta-analysis of 43 studies and found that treatment reduced sexual recidivism by 4.5 percentage points. A follow-up analysis based only on the more recent studies found a 7.5% reduction in sexual recidivism. Cognitive behavioral approaches again were most effective. Lösel and Schmucker's (2005) meta-analysis of 69 studies involving more than 22,000 offenders found a 6% reduction in recidivism among offenders who received treatment.[14]

---

[13] General Accounting Office. (June 1996). *Sex offender treatment: Research results inconclusive about what works to reduce recidivism.* GAO 96-137. Washington, DC.

[14] Lösel, F., and Schmucker, M. (2005). The effectiveness of treatment for sexual offenders: A comprehensive meta-analysis. *Journal of Experimental Criminology, 1,* 117-146

Objections and Sentencing Memo

Prentky et al. (2006) conducted a narrative review of treatment effectiveness studies and concluded that "the most reasonable estimate at this point is that treatment can reduce sexual recidivism over a five year period by between 5% and 8%."[15]  A meta-analysis of 30 studies conducted by Luong and Wormith (2006) found that sex offenders who received any treatment recidivated at a significantly lower rate than sex offenders who did not receive treatment. The researchers reported that for every 100 untreated sex offenders who sexually recidivate, 82 sex offenders who received any form of treatment will do so.[16] Again, cognitive-behavioral approaches were associated with significant reductions in recidivism whereas other treatment approaches were not.

Another study (Barnoski, 2006) examined the effectiveness of Washington's Specialized Sex Offender Sentencing Alternative (SSOSA).  Under SSOSA, certain felony sex offenders are granted in lieu of imprisonment a special sentence that involves some jail time, community supervision and outpatient treatment.[17]  The evaluation found that the five-year sexual and violent crime recidivism rates for offenders granted a SSOSA were consistently lower than the rates for the other types of sex offenders.  Another group

_____

[15] Prentky, R., Schwartz, B. and Burns-Smith, G. (2006). Treatment of Adult Sex Offenders. Applied Research Forum, National Online Resource Center on Violence Against Women. Page 5. Available at www.vawnet.org.

[16] Luong and Wormith (N.D.). Page 1.

[17] Barnoski, R. (January, 2006). Sex offender sentencing in Washington State: Special sex offender sentencing alternative trends.  Washington State Institute for Public Policy, Olympia, WA.

Objections and Sentencing Memo

conducted a meta-analysis of six rigorous studies of adult sex offender treatment with

aftercare and found that these programs reduced recidivism, on average, by 7%.[18]

There is a common misconception that pedophilia cannot be treated or addressed.

Persons with pedophilia or "pedophilic motivations" can be treated and supervised in ways

that reduce their risk of future offending. Reviews of sex offender treatment programs show

that cognitive-behavioral therapy, relapse prevention, and self-regulation have proven

successful in treating offenders. *See, e.g.*, Tony Ward, Theresa Gannon, and Pamela Yates,

*The Treatment of Offenders: Current Practice and New Development with An Emphasis on Sex Offenders*,

15 Int'l Rev. Victimology 183 (2008); Steve Aos, Marna Miller, and Elizabeth Drake,

Washington State Institute for Public Policy, *Evidence-Based Adult Corrections Programs: What

Works and What Does Not* 5-6 (2006) (concluding after review of six "rigorous" studies that

"cognitive-behavioral therapy for sex offenders on probation significantly reduces

recidivism"). As one group of researchers put it: "[e]ven if a [risk] factor is immutable with

current [treatment] technologies, treatment can still help offenders learn to manage or

compensate for the propensity." Ruth E. Mann, R. Karl Hanson, & David Thornton,

*Assessing Risk for Sexual Recidivism: Some Proposals on the Nature of Psychologically Meaningful Risk

Factors*, 22 Sexual Abuse J. Res. & Treatment 191, 209 (2010). The most effective treatments

target criminogenic needs and are consistent with the same principles of effective

—————————————

[18] Aos, S., Miller, M. and Drake, E. (2006). *Evidence-based adult corrections programs:
What works and what does not.* Washington State Institute for Public Policy, Olympia, WA.

Objections and Sentencing Memo

1    intervention used with other offenders. Karl Hanson, et.al., *The Principles of Effective Intervention*

2    *Also Apply to Sexual Offenders: A Meta-Analysis*, 36 Crim. Just. & Beh. 865, 886 (2009).

3           Mr. Streetman affirmatively seeks treatment, and has been seeking it throughout

4    the pendency of this case.  He knows, in the end, that it is the best way for him to avoid

5    repeating the past.  Studies demonstrate that he is in fact correct in this belief.  In 2003, the

6    Colorado Division of Criminal Justice conducted an evaluation of the sex offender

7    therapeutic community at the Colorado Department of Corrections (DOC) (Lowden, et al.,

8    2003).  The following key findings emerged from the study:

9           • Participation in treatment was significantly associated with success on parole.

10   An analysis of the parole completion/revocation rates of 1,585 sex offenders

11   released to parole between 1993 and 2002 indicated that nearly half of the

12   offenders who did not receive treatment were revoked back to prison. This rate

13   was three times higher than the group that received both Phase I and Phase II

14   treatment and two times higher than the group that only received Phase I

15   treatment.

16          • The length of time that an offender participates in treatment was significantly

17   related to positive outcomes after release from prison. Each additional month

18   spent in the TC increased the likelihood of success upon release by 1% (12% per

19   year).

Objections and Sentencing Memo

• Sex offenders who did NOT have treatment and who were released on parole were at least eight times as likely to get arrested for a violent crime during the first year out than those who participated in TC treatment.

• The Colorado DOC's program for sex offenders, as it was implemented in 2003, was found to effectively reduce recidivism.

The lesson learned from reviewing the literature in this area of study is that sex offender treatment can and does have significant positive effects. Treatment significantly lessens the risk of recidivism. A well-structured treatment program can have significant and long-lasting effects on its participating patients.

Mr. Streetman is eager to engage in such a program. He wants to address his problems and resolve the conflict within himself as much as anyone. Treatment can help him confront and overcome his demons, as it has already helped others. That treatment can be accomplished within the framework of a concurrent sentencing framework.

**D. Concurrent sentencing is sufficient but not greater than necessary**

A concurrent sentence is sufficient but not greater than necessary. As discussed above, an advisory guideline range of 292-360 months is more appropriate range for consideration than the range contained in the PSR. Departures and variances from 2G2.1 are increasingly common.

Mr. Streetman respectfully requests the following:

1. Use of the 292-360 month guideline range as the basis for calculation;

Objections and Sentencing Memo

19

2. A reasonable departure from that guideline range because the conduct is outside of the heartland of the guideline;

3. A reasonable variance based upon Mr. Streetman's physical and sexual abuse and the ;

4. A reasonable term of incarceration based upon these factors;

5. A reasonable term of years of supervised release; and

6. Waiver of a fine based upon indigency.


Dated:    March 16, 2017

                Respectfully Submitted,

                <u>S/Matthew Campbell</u>
                Matthew Campbell, WA 38696
                Federal Defenders of
                Eastern Washington and Idaho
                10 N Post Suite 700
                Spokane, Washington 99201
                (509) 624-7606
                (509) 747-3539
                Email:  Matt_Campbell@fd.org

Objections and Sentencing Memo

**CERTIFICATE OF SERVICE**

I hereby certify that on March 16, 2017, I electronically filed the foregoing with the Clerk of the Court using the CM/ECF System which will send notification of such filing to the following: Stephanie Joyce Lister, Assistant United States Attorney.

<u>S/Matthew Campbell</u>
Matthew Campbell, WA 38696
Federal Defenders of
Eastern Washington and Idaho
10 N Post Suite 700
Spokane, Washington 99201
(509) 624-7606
(509) 747-3539
Email:  Matt_Campbell@fd.org

Objections and Sentencing Memo